UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CARLOS ZELAYA, individually, and GEORGE
GLANTZ, individually and as trustee of the
GEORGE GLANTZ REVOCABLE TRUST, for
themselves and on behalf of all those persons
similarly situated,

       Plaintiffs,

v.

UNITED STATES OF AMERICA,

       Defendant.

CASE NO.:_____

**JURY TRIAL DEMANDED**

## CLASS ACTION AND INDIVIDUAL COMPLAINT

Plaintiffs Carlos Zelaya, individually, and George Glantz, individually and as trustee of the George Glantz Revocable Trust (collectively, "Plaintiffs"), for themselves and on behalf of all those persons similarly situated, by their attorneys, allege the following based upon the investigation of counsel, except as to allegations concerning Plaintiffs, which are based upon personal knowledge. The investigation of counsel included, among other things, a review of public filings, media and news reports, and publicly available documents and other information.

## INTRODUCTION

1. As early as 1997, the Securities and Exchange Commission ("SEC") believed that Robert Allen Stanford ("Stanford") was operating a massive Ponzi scheme, selling fraudulent offshore certificates of deposit ("CDs"), and promising unreasonably high rates of return, in the United States and throughout the world through his SEC registered broker/dealer and investment adviser company, Stanford Group Company ("SGC").

1

2. The SEC sat and watched the scheme grow for years, as it ballooned into a $7 billion enterprise, second only to Bernard Madoff as the largest Ponzi scheme in history.

3. Although the SEC believed that Stanford's operations were a fraud, and that innocent investors in the United States and abroad would eventually lose their life savings when the scheme collapsed, the SEC did nothing to stop Stanford for years.

4. As part of its duty to protect investors, however, the SEC had an obligation to: (1) report the *de facto* insolvent SGC to the Securities Investor Protection Corporation ("SIPC") so that SIPC could take control and liquidate SGC's assets; and (2) deny annual registration to SGC, to prevent it from operating in the United States and from marketing to potential investors around the world that the Stanford entities were regulated by the SEC, relying on the trust and confidence investors once placed in U.S. regulatory authorities.

5. As a result of the SEC's failure to take prompt enforcement action, investors lost — *billions*.

6. Recently, the SEC, a court-appointed Receiver in both the United States and Antigua (the offshore island where Stanford located his fraudulent bank) and hundreds of private plaintiffs have brought actions against Stanford and his bank to try to recover the billions in investments that were stolen during the years the SEC simply watched.

7. To date, and after nearly three years, the SEC Receiver has only been able to locate and recover, net of expenses, approximately $100 million of the $7 billion.

8. The SEC's gross negligence is clearly to blame.

9. Through this state law negligence class action, Plaintiffs, individually and on behalf of all those persons (the "Class" or "Class Members") who invested in Antiguan-based offshore bank Stanford International Bank Ltd. ("SIBL"), directly or indirectly, between

January 1, 1998 and February 17, 2009, inclusive (the "Class Period"), and who have filed administrative claims with the SEC, which have or will be denied — seek to recover damages caused by the grossly negligent acts of the United States in connection with the SEC's statutory violations and dereliction after learning that Stanford and SGC, as well as other related Stanford entities, were operating a Ponzi scheme.

## JURISDICTION AND VENUE

10. This action arises under the Federal Tort Claims Act, 28 U.S.C. §§ 2671, *et seq.* ("FTCA") and common law. Pursuant to 28 U.S.C. § 2675(a), on February 14 and 16, 2011, Plaintiffs submitted administrative claims to the SEC for the FTCA claim described herein. The SEC failed to respond to the claims within the statutory six-month period.

11. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1346(b).

12. Venue is proper in this District pursuant to 28 U.S.C. § 1391(e)(3), because both of the named plaintiffs reside in this District.

## PARTIES

13. Carlos Zelaya ("Zelaya") is an individual and a resident of the state of Florida. Zelaya invested $1,000,000 in SIBL as the settlor and beneficiary of the Zelaya Trust through Stanford Trust Company ("STC"), who served as the trustee, and lost virtually all of his investment when the Stanford fraud collapsed.

14. George Glantz ("Glantz") is an individual and a resident of the state of Florida. Glantz is the trustee of the George Glantz Revocable Trust. Individually and through his trust, Glantz invested approximately $650,000 in SIBL through SGC and STC, and lost virtually all of his investment when the fraud collapsed.

15. The United States of America is the federal government and is the proper party defendant under the FTCA in this action for damages resulting from the gross negligence of the United States Securities and Exchange Commission ("SEC") and its agents and employees.

## CLASS ALLEGATIONS

16. Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a class of all persons who suffered a loss from their investments in SIBL, directly or indirectly, between January 1, 1998 and February 17, 2009, inclusive (the "Class Period"), and who have filed administrative claims with the SEC, which have or will be denied. Excluded from the Class are the Defendant herein, the officers and employees of the SEC and the officers and "commissioned employees" of any Stanford related entity, including but not limited to SIBL, SGC, STC, and Stanford Fiduciary Investor Services ("SFIS"), members of any of their immediate families and their legal representatives, affiliates, heirs, successors or assigns, or predecessors in interest.

17. Members of the Class are so numerous that joinder of all of the members of the Class is impracticable. Counsel for Plaintiffs has been contacted by, and advises, hundreds of victims of the SEC's gross neglect in its violation of its statutory obligations and dereliction. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. While the exact number of Class Members is unknown at present and can only be ascertained by appropriate discovery, counsel has knowledge of hundreds of plaintiffs, and Plaintiffs believe there are thousands of members of the Class located throughout the United States and the rest of the world.

18.     Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and all Class Members were similarly affected by Defendant's wrongful conduct and have sustained damages as a result of Defendant's gross negligence as alleged herein.

19.     Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs retained counsel competent and experienced in class securities and general litigation, and intend to pursue this action vigorously. Plaintiffs have no interest that is contrary to or in conflict with the interests of the prospective members of the Class whom Plaintiffs seek to represent.

20.     A class action is a superior method of adjudicating these claims, over all other available methods for the fair and efficient resolution of this controversy. There is no difficulty, and Plaintiffs have no knowledge of any difficulty, in the management of this action as a class action.

21.     Common questions of law and fact exist as to all Class Members, and such common questions predominate over any questions solely affecting individual members of the Class, including:

      a.     whether this action is exempt from the doctrine of sovereign immunity under the Federal Tort Claims Act;
      b.     whether the SEC breached a duty of care owed to investors, statutory or otherwise nondiscretionary or non-policy based, by failing to notify SIPC that SGC was in or approaching financial difficulty;
      c.     whether the SEC breached a duty of care owed to investors, statutory or otherwise nondiscretionary or non-policy based, by failing to deny SGC's annual registration; and
      d.     the extent of damages sustained by the Class Members and the appropriate measure of such damages.

**FACTUAL ALLEGATIONS**

22. Stanford created one of the largest Ponzi schemes in history through his Antiguan-based offshore bank, SIBL.

23. SIBL issued high-interest rate CDs in supposedly safe, liquid investments. At the height of his scheme, SIBL and related entities had 30,000 customers in 130 countries managing billions of dollars in investment funds through over 140 companies, all of which were ultimately owned by Stanford himself.

24. The investments funneled into SIBL CDs were never invested in securities. Rather, investor funds were used to pay dividends to earlier investors, enrich Stanford himself, and fund speculative and unprofitable real estate and business acquisitions.

25. Stanford ran the conglomerate of Stanford entities through four main operating companies:

  a. SIBL;
  b. SGC, an SEC registered broker/dealer and investment adviser company;
  c. the Stanford Trust Company (Louisiana) ("STC"); and
  d. the representative offices of Stanford Trust Company (Antigua) that operated in Miami, Houston and San Antonio under the d/b/a "Stanford Fiduciary Investor Services" ("SFIS").

26. The primary function of the Stanford financial network was to funnel investments into the CDs issued by SIBL. The SIBL CDs were sold worldwide by a web of different Stanford promoter companies, including SGC, SFIS and STC.

27. Stanford created SGC in 1995, and registered with the SEC as a broker/dealer and investment adviser that year. The primary function of SGC was to promote investment in SIBL CDs. While SGC opened offices initially in Houston and Baton Rouge, Stanford hired brokers, bankers and other financial advisers to bring their book of clients to SGC. And SGC soon expanded from a few branch offices to more than 25 offices across the United States.

I. **AS EARLY AS 1997, THE SEC BELIEVED THAT STANFORD AND SGC WERE PART OF A VERY LARGE PONZI SCHEME**

28. The SEC received several reports that SIBL and SGC were a fraud. It conducted several investigations to the same effect, concluding that Stanford was operating a Ponzi scheme. From 1997 to 2009, however, the SEC took no action to stop the fraud, not even the statutory obligations it was required to take as a result of its findings.

29. In 1997, in its first investigation of Stanford, an SEC branch chief concluded that the SIBL CDs purported returns were "absolutely ludicrous" and that the high referral fees SGC was paid for selling the CDs indicated that they were not "legitimate CDs." The SEC Broker-Dealer Examination Group that conducted the examination stated its conclusions from the investigation of SGC as "Possible misrepresentations. Possible Ponzi scheme."

30. Moreover, the SEC discovered that Stanford had made a $19 million cash contribution to SGC, and was "concerned that the cash contribution may have come from funds invested by customers at SIB."

31. After a limited matter under inquiry ("MUI") investigation by the Enforcement Group, in 1998, the Assistant District Administrator for the Enforcement Group concluded "As far as I was concerned at that period of time in [E]nforcement we all thought it was a Ponzi scheme to start with. Always did."

32. No action was taken, however, to prevent the fraud.

33. The parting words of the former Assistant District Administrator for the Fort Worth Examination program to the branch chief in 1997 were "keep your eye on these people [referencing Stanford] because this looks like a Ponzi scheme to me and some day it's going to blow up."

34. In June 1998, the Investment Advisor Examination Group began a second examination of SGC. Based upon their examination, examiners in that group believed "that Stanford was operating some kind of fraud." Indeed, following this second examination, it was clear that both the investment adviser and broker-dealer examiners in the SEC "knew that [Stanford] was a fraud."

35. Moreover, the Investment Advisor Examination Group further determined that SGC was "extremely dependent upon [SIBL's very generous commission] compensation to conduct its day-to-day operations."

36. No action was taken, however, to prevent the fraud.

37. In 2002, the SEC Investment Adviser Examination Group again conducted an examination of SGC. At the beginning of the investigation, an examiner from the 1998 examination team "made it clear that … he suspected" that Stanford was operating a "fraud" or "Ponzi scheme." The 2002 examination group assigned SGC a "rating risk" of "1," the highest risk rating because of "suspicions [that] the international bank was a Ponzi scheme." The group concluded that the "consistent above-market reported returns" that SIBL claimed were "very unlikely" to be from "legitimate" investments.

38. No action was taken, however, to prevent the fraud.

39. Thus, by 2003, the SEC examination staff had conducted three examinations of Stanford over six years, each time concluding that he was operating a Ponzi scheme.

40. The SEC completed its fourth investigation of Stanford in 2004, concluding that the SIBL CDS were securities and "may in fact be a very large Ponzi scheme."

41. No enforcement action to prevent the fraud was taken until 2009.

## II.   THE SEC FAILED TO COMPLY WITH ITS STATUTORY OBLIGATIONS TO REPORT SGC TO SIPC AND DENY ITS ANNUAL REGISTRATION.

42.   Over the course of 12 years before the SEC took enforcement action against Stanford, the SEC breached the duty of care that it owed to investors. Moreover, the SEC's dereliction violated at least two nondiscretionary federal statutory obligations, clearly outside of any discretionary or policy determination.

43.   In particular, the SEC: (a) violated its statutory duty to notify SIPC upon learning that SGC was in or approaching financial difficulty; and (b) violated its statutory duty to deny SGC's annual registration after concluding that SGC was in violation of federal securities statutes.

### A.   The SEC Failed to Notify SIPC After Concluding That SGC Is Likely Insolvent Because It Was Part Of A Ponzi Scheme And Funded By Misappropriated Monies.

44.   SIPC is "the first line of defense" for the protection of investors in failed broker-dealers. But SIPC has no authority to investigate its members, and instead relies on the SEC and other authorities to notify it when a broker or dealer is in financial difficulty.

45.   Accordingly, Section 78eee(a)(1) of Title 15 provides that the SEC "shall immediately notify SIPC" if the SEC "is aware of facts which lead it to believe that any broker or dealer subject to its regulation is in or is approaching financial difficulty." 15 U.S.C. § 78eee(a)(1) (the "SIPC statute") (emphasis added).

46.   In each of four investigations in 1997, 1998, 2002, and 2004, the SEC concluded based upon the facts of its investigation that the SIBL CDs promoted by SGC were a Ponzi scheme and the funds invested in the scheme were used, in part, to operate SGC.

47.   By definition, a Ponzi scheme is insolvent at its inception.

48. Following each of these conclusions that SGC was part of a Ponzi scheme and financed by redeemable investor funds, the SEC had knowledge that SGC was either insolvent or approaching financial difficulty.

49. It had an obligation to notify SIPC, but did not.

50. The SEC violated the SIPC statute by failing to notify SIPC that SGC was in or approaching financial difficulty. In addition, the SEC's failure to notify SIPC that SGC was in or approaching financial difficulty was not the product of any discretionary judgment or policy determination, and was inconsistent with any reasonable standard of care in protecting investors from fraud.

### B. The SEC Failed To Deny SGC's Annual Registration After Concluding That SGC Was In Violation Of Federal Securities Statutes.

51. The SEC protects against fraud and abuse by approving the registration of only those investment advisers who have complied with the statutory registration process.

52. Accordingly, Section 80b-3(c) of Title 15 provides that where the SEC cannot "find[ ] that the requirements of this section are satisfied," the SEC "<u>shall … institute proceedings</u> to determine whether registration should be denied" and "<u>shall deny such registration</u>" if the registration "would be subject to suspension or revocation" under certain circumstances. 15 U.S.C. § 80b-3(c) (the "amendment of registration" provision) (emphasis added).

53. Those circumstances include, among others, (a) making a false or misleading statement of material fact in any application for registration, (b) willfully violating or being unable to comply with any provision of the Securities Act of 1933, the Securities Act of 1934 or the Investment Company Act of 1940, (c) willfully aiding, abetting, counseling, commanding,

inducing or procuring the violation by any other person of such statutes, or (d) failing to reasonably supervise another person who commits such a violation.

54. SGC was required to and did register with the SEC as an SEC-approved investment adviser and broker/dealer in 1995, and re-registered with the SEC annually.

55. Following the SEC's 2002 investigation of SGC, the SEC concluded that SGC was violating the anti-fraud provision of the Investment Advisors Act (15 U.S.C. § 80b-6) by failing to conduct any due diligence related to the SIBL CDs it was promoting to clients.

56. Likewise, after the SEC's 2004 investigation of SGC, the SEC concluded that SGC was willfully violating federal securities laws, including Rule 10b-5 and 10b-10 of the Securities Exchange Act of 1934 and Section 5 of the Securities Act of 1933.

57. The SEC, however, continued to register SGC annually.

58. The SEC violated the amendment of registration provisions by failing to institute proceedings to determine whether registration should be denied and deny SGC's annual registration. In addition, the SEC's failure to institute proceedings and deny SGC's annual registration was not the product of any discretionary judgment or policy determination, and was inconsistent with any reasonable standard of care in protecting investors from fraud.

## COUNT I — NEGLIGENCE

59. Plaintiffs incorporate paragraphs 1 through 58 as if set forth fully herein.

60. Over several years, the SEC received numerous complaints and information that Stanford and SGC were operating a Ponzi scheme. It conducted several investigations, each time concluding that SGC was part of a larger Ponzi scheme operated by Stanford, and was dependent upon the Ponzi scheme for its operations, as well as that SGC was in violation of several provisions of the securities laws. In each instance, however, the SEC failed to report SGC to

SIPC or deny its registration. Neither decision was based on any discretionary judgment or policy determination. They were gross derelictions of the duty of care owed to investors.

61. Moreover, the SEC had a nondiscretionary statutory duty, upon learning that SGC was part of the Stanford Ponzi scheme, to report it to SIPC as insolvent. In addition, upon learning that SGC was violating several provisions of the securities laws, the SEC had a nondiscretionary statutory duty to deny annual registration to SBC.

62. The SEC's failure directly contributed to the substantial growth of Stanford's fraud, as he repeatedly relied upon SGC's regulation and oversight by the SEC as a marketing tool to attract both United States and foreign investors.

63. After years of gross neglect, in 2009, the SEC finally initiated an action against Stanford and all of his related entities for operating the second largest multi-billion dollar Ponzi scheme in history. The SEC's belated response to this massive fraud enabled Stanford to continue to operate his Ponzi scheme during the Class Period, defrauding investors.

64. As a direct and proximate cause of Defendant's conduct, Plaintiffs and members of the class suffered substantial damages.

## JURY DEMAND

65. Plaintiffs, individually and on behalf of the Class, demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment from the Court:

    a) certifying this action as a class action;

    b) awarding compensatory and punitive damages in an amount to be proven at trial, together with interest thereupon;

   c)  awarding reasonable attorneys' fees, expenses, and costs incurred in connection with the institution and prosecution of this action;

   d)  and awarding such other and further relief as the Court deems just and appropriate under the circumstances.

December 13, 2011

                Respectfully submitted,

                KACHROO LEGAL SERVICES, P.C.


                By:/s/ Brandon R. Levitt
                Brandon R. Levitt (FBN 30471)

                Kachroo Legal Services, P.C.
                219 Concord Avenue
                Cambridge, MA 02138
                (617) 864-0755
                (617) 864-1125 (Fax)
                blevitt@kachroolegal.com

                *Attorneys for named plaintiffs Carlos Zelaya, individually, and George Glantz, individually and as trustee for the George Glantz Revocable Trust*

COUNSEL

Dr. Gaytri D. Kachroo (pro hac vice motion forthcoming)
John H. Ray, III (pro hac vice motion forthcoming)

Kachroo Legal Services, P.C.
219 Concord Avenue
Cambridge, MA 02138
(617) 864-0755
(617) 864-1125 (Fax)
gkachroo@kachroolegal.com
jray@kachroolegal.com

13